Appeal No. 13-1168
(8:11-cv-03038-DKC)

_____

**IN THE
UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT**

_____

**SARA NOSHAFAGH**

*Plaintiff - Appellant,*

**v.**

**ISIAH LEGGET, County Executive, Montgomery County, Maryland;
MONTGOMERY COUNTY FIRE AND RESCUE SERVICE**

*Defendants - Appellees.*

_____

Appeal from the United States District Court
for the District of Maryland
Judgment Order, dated January 7, 2013

_____

**OPENING BRIEF OF APPELLANT**

_____

A.P. Pishevar (Md. Fed. Bar No. 12106)
**PISHEVAR & ASSOCIATES, P.C.**
226 N. Adams Street
Rockville, MD 20850
Phone: (301) 279 – 8773
Fax:    (301) 279 – 7347
ap@pishevarlegal.com
Counsel for the Appellant

## <u>CORPORATE DISCLOSURE STATEMENT</u>

In compliance with Federal Rule of Appellate Procedure 26.1 and Local Rule 26.1, Appellant Sara Noshafagh makes the following disclosure:

1. Is party/amicus a publicly held corporation or other publicly held entity?                                                                                      NO

2. Does party/amicus have any parent corporations?          NO

3. Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?          NO

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?                                    NO

5. Is party a trade association? (amici curiae do not complete this question)                                                                                          NO

6. Does this case arise out of a bankruptcy proceeding?          NO

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ..................................................... i

TABLE OF CONTENTS ................................................................................. ii

TABLE OF AUTHORITIES ........................................................................... v

STATEMENT OF JURISDICTION ................................................................ 1

STATEMENT OF ISSUES ............................................................................. 1

STATEMENT OF THE CASE ........................................................................ 2

STATEMENTS OF THE FACTS .................................................................... 3

A.    Background ...................................................................................... 3

B.    The "2400" Line and Admin Calendar ......................................... 4

C.    Management Referred To Ms. Noshafagh As "Rat" And "Iranian Bitch"
       And Co-workers Laughed At Her Accent ...................................... 6

D.    Animal Sounds, Snickering And Ringing A Bell .......................... 8

E.    Co-workers Make False Reports About Ms. Noshafagh And Try To
       Document Ms. Noshafagh's File ................................................... 10

F.    Phone Calls To Psychologist Dr. Beasley ................................... 13

G.    May 5, 2010 Performance Appraisal ............................................ 14

H.    June 28, 2011 Written Reprimand ............................................... 15

SUMMARY OF ARGUMENT ....................................................................... 17

ARGUMENTS ............................................................................................... 19

A.    The Lower Court Erred When It Determined That Ms. Noshafagh's
       Allegation Of Retaliation Were Procedurally Barred With Respect

To Her May 5, 2010 Performance Review ................................................... 19

B.   The District Court Erred When It Determined There Are No Genuine
     Issues As To Material Facts And Failed To Consider All Material Facts .. 23

     1.   The lower Court erred when it determined that there were no
          genuine issues as to material facts with respect to Ms. Noshafagh's
          disparate treatment based on national origin claim .......................... 26

          i.   Ms. Noshafagh was subject to adverse employment actions .. 27

          ii.  MCFRS' purported reason for the disputed action is a
               pretext for discrimination ........................................................ 33

               a.   The May 2010 performance review ............................. 34

               b.   The 2011 written reprimand ......................................... 36

     2.   The lower Court erred when it determined that there were no
          genuine issues of material facts with respect to Ms. Noshafagh's
          retaliation claim .................................................................................. 39

          i.   May 2010 negative performance evaluation .......................... 39

               a.   Ms. Noshafagh established a *prima facie* case of
                    retaliation with respect to the May 2010 negative
                    performance evaluation ................................................ 39

               b.   Ms. Noshafagh has rebutted Defendant's purported
                    non-discriminatory reason for the adverse action ........ 45

          ii.  June 2011 written reprimand ................................................. 45

          iii. Harassment increased after protected activity ........................ 46

     3.   The lower Court erred when it determined that there were no
          genuine issues of material facts with respect to Ms. Noshafagh's
          hostile work environment and retaliatory hostile work
          environment claims ............................................................................ 47

i.      The harassment was based on Ms. Noshafagh's national origin ...................................................................... 48

ii.     The harassing conduct was severe and pervasive such that it altered the conditions of her employment .......................... 50

C.      The Lower Court Erred When It Determined That There Was No Invasion Of Privacy - Intrusion Upon Seclusion Claim When No Private Information Was Acquired ........................................................ 52

CONCLUSION ................................................... 55

REQUEST FOR ORAL ARGUMENT ................................. 55

CERTIFICATE OF COMPLIANCE .................................. 56

CERTIFICATE OF SERVICE ..................................... 56

## TABLE OF AUTHORITIES

### Statutes Cited

28 U.S.C. § 1331 ................................................................. 1

28 U.S.C. § 1291 ................................................................. 1

42 U.S.C. § 2000e-2 ............................................................ 2

42 U.S.C. § 2000e-3 ............................................................ 2

### Supreme Court Cases Cited

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986) ............................................ 24, 25, 31, 34

*Burlington Northern & Santa Fe Railway Co. v. White*,
    548 U.S. 53 (2006) .................................................... 29, 40

*Faragher v. City of Boca Raton*,
    524 U.S. 775 (1998) ....................................................... 48

*Harris v. Forklift Systems, Inc.*,
    510 U.S. 17 (1993) ................................................ 48, 50, 51

*Hunt v. Cromartie*,
    526 U.S. 541 (1999) ................................................... 25, 29

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986) ................................................... 24, 25

*Nat'l R.R. Passenger Corp. v. Morgan*,
    536 U.S. 101 (2002) ....................................................... 20

*Oncale v. Sundowner Offshore Serv., Inc.*,
    523 U.S. 75 (1998) ........................................................ 50

*Reeves v. Sanderson Plumbing Products, Inc.*,
    530 U.S. 133 (2000) ................................. 25, 26, 29, 31, 34, 36

*St. Mary's Honor Center v. Hicks*,
509 U.S. 502 (1993) ................................................................................. 35

*Texas Department of Community Affairs v. Burdine*,
450 U.S. 248 (1981) ........................................................................... 26, 33

## 4th Circuit Cases Cited

*Alvarado v. Bd. Of Trs. Of Montgomery Cmty. Coll.*,
848 F.2d 457 (4th Cir. 1988) ............................................................. 21, 23

*Ballinger v. North Carolina Agricultural Extension Service*,
815 F.2d 1001 (4th Circ. 1987) ................................................................ 24

*Chacko v. Patuxent Institution*,
429 F.3d 505 (4th Cir. 2005) ................................................................... 21

*Corti v. Storage Tech Corp.*,
199 F.3d 1326 (4th Circ. 1999) .................................................................. 33

*EEOC v. Sears Roebuck and Co.*,
243 F.3d 846 (4th Cir. 2001) ................................................................... 24

*Gilliam v. South Carolina Dep't of Juvenile Justice*,
474 F.3d 134 (4th Cir. 2007) ............................................................... 47, 48

*Holland v. Wash. Homes, Inc.*,
487 F.3d 208, 219 (4th Cir. 2007) ................................................. 27, 28, 29

*Hoyle v. Freightliner, LLC*,
650 F.3d 321 (4th Cir. 2011) ..................................................................... 39

*Karpel v. Inova Health System Services*,
134 F.3d 1222 (4th Cir. 1991) .................................................................. 41

*James v. Booz-Allen & Hamilton, Inc.*,
368 F.3d 371 (4th Cir. 2004) ..................................................................... 27

*Lature v. Saint Agnes Hospital*,
    No. 10-1135 (4th Cir. 2010) ........................................................ 33

*McCall v. Myrtle Beach Hosp., Inc.*,
    No 96-1201 (4th Cir. 1997) ......................................................... 33

*Mosby-Grant v. City of Hagerstown*,
    630 F.3d 326 (4th Cir. 2010) ............................................... 48, 49

*Ocheltree v. Scollon Prods., Inc.*,
    335 F.3d 325 (4th Cir. 2003) ...................................................... 50

*Smith v. First Union Nat'l Bank*,
    202 F.3d 234 (4th Cir. 2000) ..................................................... 21

*Spriggs v. Diamond Auto Glass*,
    242 F.3d 179 (4th Circ. 2001) .............................................. 39, 47

*Sydnor v. Fairfax County*,
    681 F.3d 591 (4th Cir. 2012) ..................................................... 23

*Von Gunten v. Maryland*,
    243 F.3d 858 (4th Cir. 2001) ...................................................... 47

*Williams v. Cerberonics, Inc.*,
    871 F.2d 452 (4th Cir. 1989) .............................................. 34, 35

*Wrightson v. Pizza Hut of Am., Inc.*,
    99 F.3d 138 (4th Cir. 1996) ........................................................ 48

## District Court Cases Cited

*Bernstein v. St. Paul Cos.*,
    134 F.Supp.2d 730 (D.Md. 2001) ............................................. 39

*Blasic v. Chugach Support Servs., Inc.*,
    673 F.Supp.2d 389 (D.Md. 2009) ............................................. 38

*Khoury v. Meserve*,
    268 F.Supp.2d 600 (D. Md., 2003) ........................................... 49

*Rose v. Son's Quality Food, Co.*,
   No AMD 04-3422, 2006 WL 173690 (D.Md. Jan 25, 2006) ..................... 49

*Smith v. Vilsack*,
   832 F.Supp.2d 573 (D.Md. 2011) ............................................. 26

## Maryland Court Appeals Cases Cited

*Bailer v. Erie Ins. Exchange*,
   344 Md. 515 (Md. 1997) ............................................... 53

*Hollander v. Lubow*,
   277 Md. 47 (Md. 1976) ............................................... 54

## Maryland Court of Special Appeals Cases Cited

*Allen v. Bethlehem Steel Corp.*,
   76 Md. App. 642 (Md. App. 1988) ........................................... 52

*Furman v. Sheppard*,
   130 Md.App. 67 (Md. App. 2000) ........................................... 52

*Klipa v. Bd. of Educ. of A.A. Co.*,
   54 Md.App. 644 (Md. App. 1983) ...................................... 52, 53

*Mitchell v. Baltimore Sun Co.*,
   164 Md.App. 497 (2005) ............................................... 54

## STATEMENT OF JURISDICTION

The District Court had jurisdiction pursuant to 28 U.S.C. § 1331.  On January 7, 2013, the District Court entered an order granting Defendants' Motion for Summary Judgment and dismissed this action.  Sara Noshafagh, Plaintiff - Appellant ("Ms. Noshafagh"), filed a timely appeal on February 5, 2013.  This Court has jurisdiction pursuant to 28 U.S.C. § 1291.

## STATEMENT OF ISSUES

1.      Did the District Court err when it determined that Ms. Noshafagh's allegation of retaliation were procedurally barred with respect to her May 5, 2010 performance review?

2.      Did the District Court err when it determined that there are no genuine issues of material fact with respect to Ms. Noshafagh's disparate treatment based on national origin claim?

3.      Did the District Court err when it determined that there are no genuine issues of material fact with respect to Ms. Noshafagh's retaliation claim?

4.      Did the District Court err when it determined that there are no genuine issues of material fact with respect to Ms. Noshafagh's hostile work environment and retaliatory hostile work environment claim?

5.    Did the District Court err when it determined that there is no Intrusion Upon Seclusion claim when no private information is actually acquired?

## STATEMENT OF THE CASE

Ms. Noshafagh filed her Complaint in the United States District Court for the District of Maryland on October 24, 2011.  She filed an Amended Complaint on January 11, 2012.  Ms. Noshafagh's Amended Complaint stated that her federal civil rights were violated pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.*, at §§ 2000e-2 and 2000e-3.  Joint Appendix ("JA") 25-6 at ¶¶ 20-23.  Ms. Noshafagh further asserted a State-law claim of Invasion of Privacy - Intrusion Upon Seclusion, for Defendants' intentional invasion and intrusion upon Ms. Noshafagh's seclusion, solitude and privacy when Defendant contacted her psychologist and requested records.  JA-26 at ¶¶ 24-28. On January 17, 2011, Defendants filed their Answer to the Amended Complaint.

After the Parties engaged in discovery, Defendants filed a Motion for Summary Judgment on June 5, 2012.  Ms. Noshafagh filed her Opposition on June 22, 2012.  Defendants then filed a Motion to Strike certain exhibits attached to the Ms. Noshafagh's Opposition, on July 9, 2012, and on the same day filed a Reply to Ms. Noshafagh's Opposition.  Ms. Noshafagh filed her Opposition to the Motion to

Strike on July 23, 2012 and Defendants filed their Reply to the Opposition to the Motion to Strike on August 1, 2012.

Without holding a hearing, the District Court granted Defendants' Motion for Summary Judgment and dismissed the action on January 7, 2013.  Ms. Noshafagh filed her Notice of Appeal on February 5, 2013 and this appeal followed.

## STATEMENT OF FACTS

### A.    Background

Ms. Noshafagh is Iranian. JA-392 at ¶ 2.  In 1997, she immigrated to the United States from Iran.  *Id*.  Montgomery County hired Ms. Noshafagh in 2001. JA-392 at ¶ 4.

In 2006, Ms. Noshafagh began working for a division of the Montgomery County government, the Montgomery County Fire and Rescue Service ("MCFRS"), as an Office Service Coordinator ("OSC").  JA-392 at ¶ 3.  She has served MCFRS as an OFC for more than six years.

In October 2009, Ms. Noshafagh filed an internal complaint with MCFRS alleging that the MCFRS was discriminating against her and harassing her because of her national origin.  JA-522.  After a cursory investigation, MCFRS ultimately

concluded that it was not discriminating or harassing Ms. Noshafagh based on her national origin. JA-235 at ¶ 4.

On three different occasions, May 19, 2010, May 17, 2011, and July 8, 2011, Ms. Noshafagh filed charges of discrimination with the United States Equal Employment Opportunity Commission ("EEOC"). JA-522; JA-523; JA-525. Each time she alleged that MCFRS was discriminating against her because of her national origin and retaliating against her for filing EEO complaints. *Id.* Each of her EEOC complaints stated that MCFRS's national origin discrimination and retaliation was continuing in nature. *Id*.

**B.    The "2400" Line And Admin Calendar**

The "2400" Line refers to the main MCFRS non-emergency telephone number. Determining responsibility for answering the "2400 Line" became a source of contention between Ms. Noshafagh and other OSC's. JA-399 at 15:11. Roxana Funes was the OSC primarily responsible for answering the 2400 Line. JA-437 at 29:20-1. Another OSC (not Ms. Noshafagh) backed-up Ms. Funes. JA-422.

Ms. Funes often broke protocol by directing Ms. Noshafagh to be her primary back-up despite the fact that it was not Ms. Noshafagh's duty. JA-392-3 at ¶ 6. Ms. Funes would instruct Ms. Noshafagh to cover the 2400 Line during the

work day and then leave the premises and not return until the following day often. JA-393 at ¶ 8.

For example, on January 29, 2010, Ms. Noshafagh informed Ms. Funes that she (Ms. Noshafagh) could not answer the 2400 Line.  JA-505.  Ms. Noshafagh told Ms. Funes,  "[I have a] very bad cold and I can not talk.  I am coughing all the time and I can not answer the phone today."  *Id*.  Ms. Funes transferred the 2400 Line to Ms. Noshafagh anyway.  JA-393 at ¶ 9.

On September 24, 2009, Ms. Noshafagh covered the 2400 Line far longer than scheduled.  She asked Ms. Funes when she would be relieved and Ms. Funes responded by threatening to report Ms. Noshafagh's "harassment" to management and that she would "transfer the 2400 Line to you when I feel it is necessary. Again, do not email me again (sic)."  JA-506.

Ms. Noshafagh reported Ms. Funes' protocol violations and rude behavior to MCFRS management on several occasions.  JA-393 at ¶ 11.  MCFRS never responded to those reports.  JA-392 at ¶ 5.

Liberty Martin, who is Caucasian and was born in the United States, would collect leave slips from OSC's, Ms. Martin then tracked the OSC's leave on an administrative calendar.  JA-437 at 27:7-13.  Ms. Martin, scrutinized Ms. Noshafagh more heavily than she scrutinized other OSC's.  JA-393 at ¶ 11.  She entered Ms. Noshafagh on the administrative calendar as being on leave when she

arrived late or left early.  *Id*.  But Ms. Martin gave the other OSC's a free pass when they arrived late and left early.  *Id*.  Ms. Noshafagh's co-worker, Jacqueline Ross, corroborated that Ms. Martin filled out the administrative calendar in an "inconsistent and bias[ed]" manner.  JA-497.

For example, the administrative calendar did not indicate that Ms. Funes took leave on February 25, 2011, (JA-498) or that Ms. Funes and another OSC, Cecilia Johnson, took leave on February 8, 2011.  *Id*.  But Ms. Martin would mark Ms. Noshafagh as "late" when she actually was in the office on time.  JA-513.  Ms. Noshafagh is the only OSC who is required to report to the fire chief's office when she takes leave.  JA-500.

## C.     Management Referred To Ms. Noshafagh As "Rat" And "Iranian Bitch" And Co-workers Laughed At Her Accent

In April 2007, Ms. Noshafagh used a long word during a training class in the presence of Ms. Martin and Ms. Funes.  JA-392 at ¶ 5.  They repeated Ms. Noshafagh's pronunciation of the word while laughing and making jokes about her Iranian accent.  *Id*.

Ms. Martin and Ms. Funes repeatedly chided Ms. Noshafagh about her accent.  Ms. Noshafagh complained about this behavior to MCFRS management.

JA-392 at ¶ 5.  MCFRS never directed Ms. Martin or Ms. Funes to stop making light of Ms. Noshafagh's accent.  *Id*.

On another occasion, Ms. Noshafagh passed the office of David Steckel, a MCFRS manager.  Ms. Noshafagh overheard a conversation between Mr. Steckel and another MCFRS manager, Randy Wheeler.  JA-393 at ¶ 10.  She heard Mr. Wheeler state "What? I am not talking about the Iranian bitch!"  *Id*.  Ms. Noshafagh knew that Mr. Wheeler was talking about her.  *Id*.  No other MCFRS employees are Iranian.  *Id*.

Also in 2009, Ms. Noshafagh heard MCFRS manager Wayne Courtney, state: "the problem is this: the rat."  JA-393-4 at ¶ 15.  Mr. Courtney looked at Ms. Noshafagh when he made this statement.  *Id*.  He made this statement shortly after he called Ms. Noshafagh's psychologist to obtain her personal psychological treatment information, discussed *infra*.  *Id*.

Furthermore, throughout Ms. Noshafagh's time at MCFRS, Scott Goldstein, also in management, would use profanity when he spoke to Ms. Noshafagh, including the use of the "F" word.  JA-393 at ¶ 13.  Ms. Noshafagh never observed Scott Goldstein speaking to anyone else in this manner.  *Id*.  Although Ms. Noshafagh complained to management about the way Scott Goldstein spoke to her, the behavior continues.  *Id*.

**D.     Animal Sounds, Snickering And Ringing A Bell**

Division Chief Lohr, who is Caucasian and born in the United States, has been Ms. Noshafagh's first-line supervisor since October 2008.  JA-397 at 9:5-7. He learned that Ms. Noshafagh had filed an internal complaint against MCFRS around the end of 2009 or beginning of 2010.  JA-397 at 9:11-19.  Ms. Noshafagh reported to Chief Lohr that Ms. Martin was making cat sounds and meowing at her from the middle of 2009 until present.  JA-398 at 13:16-21.  Ms. Noshafagh also complained to Lindy Dowdy about the sounds that Ms. Martin was making.  JA-398-9 at 13:13-14:10.  Ms. Martin would make these sounds when Ms. Funes or Ms. Johnson was present, or when she was alone with Ms. Noshafagh.  JA-393 at ¶ 14.  Ms. Martin meowed to echo a Persian cat.  Debra Shaw, who is Caucasian, born in the United States and part of management, had conversations with a number of individuals, including Chief Ed Radcliffe, regarding the cat sounds Ms. Martin was making towards Ms. Noshafagh.  JA-423 at 50:9-12; JA-418 at 27:13-29:10.  MCFRS never told Ms. Martin to stop making cat sounds in Ms. Noshafagh's presence.  JA-400 at 19:10-15.

Around the end of 2010 and beginning of 2011, Chief Lohr learned that Ms. Martin rang a bell every time Ms. Noshafagh walked past.  JA-400 at 19:10-15. On one occasion, Mr. Leigh was in Liberty Martin's office when she was ringing the bell a few times.  JA-434 at 16:13-18.  Mr. Leigh has been the Disciplinary

8

Chief for MCFRS since the end of 2010.  JA-399 at 17:10-13.  He investigated

whether the County should discipline employees engaged in misconduct.  JA-400

at 18:20-19:3.  Mr. Leigh failed to report to Chief Lohr that Ms. Martin rang a bell

when Ms. Noshafagh walked past her office, even though Mr. Leigh was present

when this occurred.  JA-400 at 19:10-15.

     Chief Lohr testified that he was disappointed that Mr. Leigh was present

when Ms. Martin harassed Ms. Noshafagh.  JA-400 at 20:8-12.  Despite Mr.

Leigh's presence during this the bell ringing, Ms. Martin was not written up until

another MCFRS employee, Richard Riffe, complained.  JA-212 at ¶ 12.  In fact,

Liberty Martin was caught ringing the bell on January 10, 2011 and was not given

the "Counseling Memo" until February 2, 2011.  JA-426 at ¶ 1; JA-417 at 24:1-

25:7.  That "Counseling Memo" discounts the harassing nature of Liberty Martin's

actions, as Debra Shaw writes "[w]hen she walks on that side of the hallway [Ms.

Noshafagh's] greetings to individuals are loud, disruptive and distracting" and

"you felt that this was excessive and annoying and possibly deliberate in her

intentions."  JA-426 at ¶ 3.

     Beth Feldman, one of Ms. Noshafagh's co-workers, witnessed Ms. Martin

harass Ms. Noshafagh.  JA-446.  Ms. Feldman wrote in an email that

"[d]isciplinary action would be taken against [Liberty Martin] for her threats and

behavior against [Ms. Noshafagh], and it would be if she weren't wrongly

protected by [Debra] Shaw and Chief Wheeler." JA-447. As a result of this harassing behavior, Ms. Noshafagh would use the ladies room on the 8th and 11th floors of the building in order to get away from Liberty Martin and the others. JA-446.

**E.    Co-workers Make False Reports About Ms. Noshafagh And Try To Document Ms. Noshafagh's File**

Chief Ed Radcliffe told Ms. Martin to document issues relating to Ms. Noshafagh, regardless of whether they are large or small. JA-400 at 21:3-11. Ms. Martin cannot remember how many times she has reported incidents about Ms. Noshafagh, but it is "[a] lot". JA-400 at 38:3-7.

Chief Lohr testified that Ms. Martin accused Ms. Noshafagh of slamming the door in Liberty Martin's face. JA-400 at 20:18-21 Although the door cannot be slammed, Chief Lohr conducted an investigation into this by having an executive officer pull a video record from the security camera. JA-400-401 at 21:12-22:2. The security footage revealed that Ms. Noshafagh did not slam the door. JA-400 at 21:17-8. Ms. Martin stated that the purpose of this report was "[t]o document the file." JA-438 at 33:1-22. Ms. Martin also stated that during the incident she said "Thank you, Sara, for opening the door for me" and that Ms. Noshafagh responded "[y]ou're welcome Liberty." JA-439 at 34:12-8. The

security footage shows that no words were spoken between Ms. Noshafagh and Ms. Martin during this incident.  JA-444.[1]

In February 2010, Ms. Martin reported to management that Ms. Noshafagh struck her in the hip with a drawer in the 12th floor kitchen.  JA-439 at 36:4-10. Ms. Martin did not present actual corroboration for her bald accusation.  JA-439 at 36:11-7.  Ms. Martin alleged that Ms. Noshafagh's actions "warrant disciplinary action."  JA-459.  Also in February 2010, Ms. Martin reported to management that Ms. Noshafagh approached her from behind and abruptly pushed past her and caused her to lose her balance.  JA-439 at 36:18-37:1.  Although the two incidents happened a few days apart, Ms. Martin did not remember which one happened first.  JA-439 at 37:9-10.

On January 11, 2010, Ms. Martin reported to management that Ms. Noshafagh wrote on an envelope, for the mail to be forwarded to the correct person, and that this was improper procedure.  JA-451.  On June 6, 2008, Ms. Martin reported to management that she heard from other employees that Ms. Noshafagh was documenting when Ms. Funes was coming in late, coming back from lunch late and telling Ms. Noshafagh to cover the 2400 Line when it was not her time to cover the phones.  JA-452.  Ms. Martin also reported that Ms. Noshafagh told her that it was not her time to cover the phones, and that these

---

[1] The CD, which was transmitted as part of the lower Court's record, illustrates that this alleged conversation never took place.

behaviors are "extremely unprofessional" and "needs to be addressed at the Division Chief level." *Id.* On May 1, 2008, Ms. Martin reported to management that Ms. Noshafagh "abrasively" told her and Ms. Funes that it was "not my time" to take the 2400 Line. *Id.* During this incident, Ms. Noshafagh did take over the 2400 Line, even though she was not yet scheduled to be at work. *Id.* On September 23, 2009, Ms. Martin contacted management to report that Ms. Noshafagh should "cut Roxana [Funes] a little slack" when asking Ms. Funes if she has taken the 2400 Line back yet. JA-456. On April 13, 2011, Ms. Martin reported to management that Ms. Noshafagh lacks the ability to communicate, is abrasive and unprofessional, since Ms. Noshafagh smiled and said "Hi" or "Hello" and then stopped once she saw that it was Liberty Martin. JA-449. Similarly, on July 29, 2010, Ms. Martin reported to management that Ms. Noshafagh lacked professionalism and common courtesy, since there was an incident where Ms. Noshafagh began to apologize to Ms. Funes when they were both pushing a door from opposite sides, but stopped the apology when she saw it was Ms. Funes. JA-450.

Liberty Martin would also forward second hand complaints to Chief Lohr, from Roxana Funes specifically, about Ms. Noshafagh. JA-401 at 22:3-11. Liberty Martin would also complain to Chief Lohr about Ms. Noshafagh's quality of work. JA-401 at 22:12-7. Management would always side with Ms. Martin,

despite the fact that they were aware that she had created false reports about Ms. Noshafagh, that Ms. Noshafagh had complained about Liberty Martin's harassment numerous times in the past and that she had actually been caught ringing a bell every time Ms. Noshafagh walked past. JA-394 at ¶ 16.

**F.    Phone Calls To Psychologist Dr. Beasley**

In 2010, Chief Wayne Courtney called Dr. Michael Beasley and pressed him to disclose Ms. Noshafagh's personal psychological information. JA-515 at ¶ 6. Chief Wayne Courtney described Ms. Noshafagh as "the employee who was from Iran." *Id.* During the phone call, Dr. Beasley told Chief Wayne Courtney multiple times that he could not "divulge psychological information about patients, but Courtney would not take 'no' for an answer and kept pressing [him] for information. JA-515-6 at ¶ 7. In response to this, Ms. Noshafagh complained to Chief Lohr about Chief Wayne Courtney calling Dr. Beasley. JA-401 at 25:5-8. The MCFRS website states that "[t]he highest priority of the Team are placed on confidentiality and respect for the feelings of the individuals involved. JA-519. The website also states that "[c]onfidentiality is strictly enforced and note taking is not allowed." *Id.*

Dr. Beasley is the Clinical Psychologist at MCFRS, and has been treating Ms. Noshafagh for her work-related stress, anxiety and depression since 2008. JA-

515 at ¶ 2-3.  Dr. Beasley treats Ms. Noshafagh in order to manage her workplace stress, anxiety and depression, which is a direct result of the abusive manner in which Ms. Noshafagh is treatment by management and co-workers at MCFRS. JA-515 at ¶ 4.

## G.    May 5, 2010 Performance Appraisal

Chief Lohr drafted Ms. Noshafagh's May 5, 2010 performance appraisal for performance review period May 2009 until May 2010.  JA-403 at 30:9-22.  Chief Lohr testified that he spoke to Chief Barry Reid about Ms. Noshafagh's performance evaluation before he drafted it.  Chief Lohr testified that Chief Reid's "number one frustration was Ms. Noshafagh's lack of knowledge of the organization."  JA-403 at 32:6-11.  However, Chief Lohr rated Ms. Noshafagh as "meets expectations" in this category.  JA-403 at 32:18-20; JA-463.  Chief Lohr rated Ms. Noshafagh "below expectations" on expectation 4 because she "has been unable to foster professional relationships with some of those who may not understand or respect her personal values.  As a result, unresolved conflicts exist between Sara and others on the 12th floor that prevents professional communication and routine conflict resolution."  JA-464.  Unresolved conflicts" is a reference to "Liberty Martin, Debra Shaw, Scott Goldstein, the fire chief, at time, Chief Radcliffe, at the time Chief Courtney…."  JA-405 at 38:13-20.  However, Debra

Shaw, another manager, gave Liberty Martin 4/4 on three categories and 3/4 on two categories. JA-419 at 32:4-33:15; JA-429-30.

During this same evaluation period, Ms. Martin received an overall rating between "highly successful performance" and "Exceptional performance.", He did not mention the "discipline" MCFRS issued her for ringing a bell when Ms. Noshafagh walked past her desk. JA-419 at 33:16-22. Debra Shaw explains that the reason she did not include the "discipline" on the performance appraisal is that the counseling memo Ms. Martin received for harassing Ms. Noshafagh with the bell is not really discipline, since it is not on the level of "disciplinary action." JA-420 at 34:1-7.

Chief Lohr testified that he could not think of any situation where employee discipline would have no impact on a performance evaluation. JA-402 at 29:17-29:22. Debra Shaw agreed with Chief Lohr that an employee's disciplinary record would be considered by a supervisor when doing the performance evaluation of a subordinate. JA-419 at 31:6-13.

## H.    June 28, 2011 Written Reprimand

Around December 2010, Ms. Martin reported to Ms. Shaw that Ms. Noshafagh was discussing confidential information with other employees. JA-419 at 30:15-31:18. Specifically, Ms. Martin told Ms. Shaw that Ms. Noshafagh was

discussing confidential information regarding employees Ashley Robinson and Jon Krespan. JA-435 at 19:13-20:5. Ms. Martin found out about this when she was talking to Ashley Robinson about Ms. Noshafagh outside of work. JA-435 at 20:6-21:5. Furthermore, Ms. Martin was talking to Jon Krespan after she forced herself onto an elevator that Ms. Noshafagh was riding, when she learned that Ms. Noshafagh had spoken to Jon Krespan on a prior occasion. JA-435-6 at 21:6-22:18. Liberty Martin and Jon Krespan then later spoke in Liberty Martin's office, with the door closed, about Ms. Noshafagh. JA-436 at 22:7-10.

On June 28, 2011, MCFRS issued Ms. Noshafagh a written reprimand for repeating a conversation she overheard. JA-468. About five (5) months after Ms. Noshafagh allegedly repeated the information, MCFRS investigated Ms. Noshafagh. *Id*. This "confidential information" was allegedly repeated to those who would already know about the information. JA-473. MCFRS Code of Ethics states that an investigation into violations of the Code of Ethics "must promptly begin." JA-479 at b. Division Chief Steckel and Assistant Chief Radcliffe spoke openly about this "confidential information" so that Ms. Noshafagh could overhear the information. JA-486 at ¶ 16. Division Chief Wheeler and assistant Chief Radcliffe also spoke openly about this "confidential information." JA-486 at ¶ 16.

Ms. Shaw knew Ms. Noshafagh was accused of disclosing confidential information, because she discussed it with Ashley Robinson. JA-420 at 37:2-18.

16

Ms. Robinson told Ms. Shaw that she was interviewed regarding her conversation with Ms. Noshafagh.  JA-420 at 37:2-4.  Ms. Shaw first denied speaking with Ms. Martin about the facts surrounding Ms. Noshafagh's June 28, 2011 reprimand, but then admitted that Ms. Martin brought this confidential information to her attention.  JA-421 at 38:15-39:14/  Ms. Martin reported conversations that Ms. Noshafagh allegedly had with Ms. Robinson, and was also the person who reported that Ms. Noshafagh had conversations with Jon Krespan.  JA-421 at 39:16-41:9.

MCFRS has not investigated or reprimanded an individual other than Ms. Noshafagh for talking about personnel or confidential matters in the past five (5) years.  JA-485-7 at ¶¶ 8 and 18; JA-422-3 at 47:7-50:1; JA-402 at 27:4-16.  No ethics regulation prohibits employees from talking about confidential information. The only section in the regulations which mentions confidential information applies only to the "custodian of records", and is referring to "inspection of an individual's personnel record.  JA-478.

## SUMMARY OF ARGUMENTS

Ms. Noshafagh brought this claim because of severe and persistent harassment at her place of employment, based on national origin.  After she filed an internal complaint, complaining about this harassment, MCFRS retaliated and created an even more hostile work environment.  They even went so far as to insist

the Ms. Noshafagh's psychologist turn over private and confidential medical records. This behavior and treatment of Ms. Noshafagh has been continuing for over six years.

After discovery was conducted, MCFRS filed a Motion for summary judgment. JA-8 at Dkt. No. 13. The lower Court granted it on all counts of Ms. Noshafagh's complaint, concluding that some of her Title VII claims were procedurally barred, and that as to the remaining, there were no genuine issues of material fact. *See generally*, JA-1284-1325. The lower Court further concluded that since no private or confidential information was actually acquired by MCFRS, Ms. Noshafagh's invasion of privacy - intrusion upon seclusion claim could also not stand. *Id*.

The lower court erred for three major reasons. First, the performance evaluation was not procedurally barred, as Ms. Noshafagh stated that she was subjected to retaliation in her first EEOC charge and that the actions were continuing in nature. JA-522. Second, the lower Court failed to give the proper weight to a large number of material facts, and in many instances, failed to even consider material facts when it concluded that there are no genuine issues with respect to the Title VII claims. Finally, the lower Court's conclusion that since no private and confidential information was actually obtained, there is no basis for an intrusion upon seclusion claim, is erroneous as actual acquisition of information is

18

not an element of the claim.  As such, the lower Court's dismissal of all of Ms.

Noshafagh's claims should be reversed.

## **ARGUMENTS**

**A.**    **The Lower Court Erred When It Determined That Ms. Noshafagh's Allegation Of Retaliation Were Procedurally Barred With Respect To Her May 5, 2010 Performance Review.**

Ms. Noshafagh filed an internal complaint and three separate complaints

with the EEOC over a multi-year period, alleging recurring disparate treatment,

constant hostility, and retaliation.  JA-522-6.  Ms. Noshafagh should not be

procedurally barred from asserting retaliation in the present lawsuit because

Defendant was put on notice early and often, and because the EEOC was provided

ample notice to pursue an investigation that would have revealed the same specific

allegations and claims raised in the instant lawsuit.  Furthermore, this Court should

reverse the lower Court's ruling that Ms. Noshafagh's claim of retaliation regarding

her May 5, 2010 negative performance review was procedurally deficient, because

Ms. Noshafagh timely filed her EEOC charge of retaliation on May 19, 2010.  JA-

522

The lower Court asserted that EEOC Charge #1 did not mention the negative

performance review, but rather focused the allegations on harassment from her co-

workers, cat meowing by Liberty Martin, and Assistant Chief Wayne Courtney's call to Dr. Beasley.  JA-1303 at ¶ 1.  The lower Court disregards the fact that EEOC Charge #1 makes three references to retaliation: (1) paragraph three of the narrative section, which states: "I believe I have been…retaliated against…."; (2) Ms. Noshafagh checked the box for "retaliation"; and (3) Ms. Noshafagh checked the box for "continuing action".  These three references, taken together, under the totality of the circumstances, sufficiently put Defendant on notice that a claim of retaliation was made, and a reasonable investigation would have led to further clarification about the retaliation claim.

The lower Court reliance on *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 120 (2002) was misplaced.  *Morgan* stands for the proposition that in a hostile work environment claim, so long as one discrete act is alleged timely, then any acts outside of the requisite timeframe are still actionable, so long as they arise out of the same hostile, discriminatory work environment.  *Id*. at 120.  *Morgan* attempts to provide employers a recourse when a Plaintiff unreasonable delays filing a charge.  *Id*. at 121.  The instant case is starkly different than *Morgan* in that Ms. Noshafagh did not unreasonable delay any charge.  To the contrary, she provided notice early and often, through three different charges.  There is simply no prejudice akin to any concerns in *Morgan*.

Although Ms. Noshafagh did not specifically describe the May 5, 2010 performance review in the narrative section of EEOC Charge #1, she thoroughly described it in her May 17, 2011 EEOC Charge (EEOC Charge #2) and her July 11, 2011 EEOC Charge (EEOC Charge #3).  In addition, she did not file a lawsuit until after all three EEOC charges had been filed and she subsequently received her right to sue letter.  As this Court has previously stated, "lawyers do not typically complete the administrative charges, and so courts construe them liberally." *Chacko v. Patuxent Institution*, 429 F.3d 505, 509 (4th Cir. 2005) (*citing Alvarado v. Bd. Of Trs. Of Montgomery Cmty. Coll.*, 848 F.2d 457, 460 (4th Cir. 1988).  Of course, this Court has also warned that if the factual foundation in the administrative charge is too vague to support a claim that is later presented in subsequent litigation, that claim will also be procedurally barred. *Chacko v. Patuxent Institution*, 429 F.3d 505, 509 (4th Cir. 2005).  "At the same time, however, if the factual allegations in the administrative charge are reasonably related to the factual allegations in the formal litigation, the connection between the charge and the claim is sufficient." *Id.* (*citing Smith v. First Union Nat'l Bank*, 202 F.3d 234, 247-48 (4th Cir. 2000)).  Congress's rationale for the exhaustion requirement was to serve the primary purposes of **notice** and **conciliation**. *Chacko*, 429 F.3d at 510 (*emphasis added*).  An administrative charge notifies the employer of the discrimination, gives the employer an opportunity to voluntarily

and independently investigate and resolve the situation, and prevents the employer from later complaining of prejudice since it has known of the allegations since the very beginning. *Id.* Furthermore, it initiates agency-monitored settlement.

In *Chacko*, this Court found that the sharp differences in the trial evidence and the allegations in the administrative charges compelled the conclusion that Chacko failed to exhaust administrative remedies. *Id.* at 511. The instant circumstances of Ms. Noshafagh's case is sharply distinguishable from both *Chacko* and the above-mentioned policy rationales for strictly enforcing the administrative exhaustion rule. Ms. Noshafagh not only alleged retaliation in EEOC Charge #1, but she also alleged retaliation in EEOC Charge #2 and EEOC Charge #3. In Charges 2 and 3, she specifically described the May 5, 2010 negative performance as a discriminatory act in retaliation for her 2009 verbal internal affairs complaint. In all three EEOC charges, Ms. Noshafagh marked the box "continuing action" and the box "retaliation." In contrast to the facts in *Chacko*, Ms. Noshafagh's litigation claim of retaliation, vis-à-vis the May 5, 2010 negative performance appraisal, exactly reflects the retaliation complaints alleged in all three EEOC charges.

Furthermore, a reasonable investigation of the allegations in EEOC Charge #1 would have led to Ms. Noshafagh being asked for clarification about what retaliation she specifically was referring to in her complaint. Moreover, if the

investigation immediately after EEOC Charge #1 did not reveal Ms. Noshafagh's belief that her negative performance review was retaliatory, Defendant and the EEOC were certainly put on notice when EEOC Charge #2 was filed. The fact that another three months passed before EEOC Charge #3 was filed, demonstrates that ample time passed for Congress' rationale of investigation and attempts at conciliation to be met. Indeed, formal litigation did not begin until Ms. Noshafagh filed her complaint on October 24, 2011. JA-1295 at ¶ 3.

Additionally, the fact that Ms. Noshafagh is not an attorney is important. The EEOC charging process understands that a layperson should not be expected to complete the EEOC charging document with the precision and clarity of an attorney. *Chacko*, 429 F.3d at 509 (acknowledging that since lawyers do not typically complete the administrative charges, courts construe them liberally) (*citing Alvarado v. Bd. Of Trs. Of Montgomery Cmty. Coll.*, 848 F.2d 457, 460 (4th Cir. 1988). This Court recently cautioned that "dwelling on such technicalities, we would only undermine the congressional preference for agency resolution in this area. A quest for absolute precision in the administrative charge would only 'encourage individuals to avoid filing errors by retaining counsel,' thereby 'increasing both the cost and likelihood of litigation." [citations omitted]. We decline to read the exhaustion requirement that strictly." *Sydnor v. Fairfax County*,

681 F.3d 591, 597 (4th Cir. 2012).  To dismiss Ms. Noshafagh's retaliation claim on

such a technicality would cause manifest injustice.

As such, Ms. Noshafagh should be allowed to proceed on her retaliation

claim based on the May 19, 2010 performance review.[2]


**B.    The District Court Erred When It Determined There Are No Genuine
Issues As To Material Facts And Failed To Consider All Material Facts.**

Summary Judgment should only be granted when there are no genuine issues

of material facts.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).  In

evaluating a motion for summary judgment, the Court must view all evidence in

the light most favorable to the non-moving party.  *Matsushita Elec. Indus. Co., Ltd.*

*v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *EEOC v. Sears Roebuck and Co.*,

243 F.3d 846, 849 (4th Cir. 2001) ("[F]or purposes of summary judgment, [the facts

as related by the non-movant] must be accepted as true").  Given its "drastic

nature," summary judgment should not be granted "unless it is perfectly clear that

there are no genuine issues of material fact in the case and especially in

employment discrimination case, as here, when the state of mind is a decisive

element of a claim…."  *Ballinger v. North Carolina Agricultural Extension*

---

[2] Plaintiff will discuss the application of May 19, 2010 performance review *infra*,
in sections B(1)(ii)(a) and B(2)(i), in her discussion that there are genuine issues as
to material facts for the Title VII claims, including the claim of retaliation.

*Service*, 815 F.2d 1001, 1004-05 (4th Circ. 1987) (*internal citations omitted*). The Court is not free to pick and choose which material facts to consider and must look at the material facts in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150; 120 S.Ct. At 2110 (2000). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Reeves*, 530 U.S at 150 (*quoting Liberty Lobby*, 477 U.S. at 255.)

Furthermore, in discrimination cases, admissions of racial motivations are rare and Plaintiff's must often rely on circumstantial evidence. *Hunt v. Cromartie*, 526 U.S. 541, 553 (1999). The Court must look at and consider the totality of circumstances when determining whether to grant summary judgment.

In the instant case, the lower Court failed to consider a number of material facts in determining whether summary judgment should be granted. Furthermore, the Court erred in determining that there are no genuine issues as to material facts with respect to Ms. Noshafagh's claim of Disparate Treatment, Retaliation and Hostile Work Environment. Finally, the lower Court's approach in reviewing the facts was in error. Rather than considering the totality of the circumstances, the lower court ruled on each material fact in a vacuum without considering other related and important material facts in its determination. For this reason, the lower

25

court's determination that there are no genuine issues as to material facts with respect to Ms. Noshafagh's Disparate Treatment, Retaliation and Hostile Work Environment claims should be reversed.

**1.    The lower Court erred when it determined that there were no genuine issues as to material facts with respect to Ms. Noshafagh's disparate treatment based on national origin claim.**

In employment discrimination cases, evidence is evaluated under a tripartite allocation of proof.  First, the Plaintiff must establish a *prima facie* case of discrimination.  Second, the Defendant must "articulate some legitimate, non-discriminatory reason" for the employment action.  Third, "the plaintiff may attempt to establish that he was the victim of intentional discrimination by 'showing that the employer's proffered explanation is unworthy of credence'" or through other means.  *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 143 (2000) (*quoting Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 256 (1981)).

In order to establish a *prima facie* case for disparate treatment, Plaintiff must show (1) that she is a member of a protected class; (2) that Plaintiff was qualified for the job; (3) that Plaintiff was subject to an adverse employment action; and (4) that there are circumstances supporting an inference of discrimination.  *Smith v.*

*Vilsack*, 832 F.Supp.2d 573, 582 (D.Md. 2011). As there is no doubt that Ms.

Noshafagh is a member of a protected class (Iranian) and no allegation that she

was not qualified for the job, Plaintiff will focus only on the latter two

requirements.

### i.    Ms. Noshafagh was subject to adverse employment actions.

The 4th Circuit has held that an adverse employment action is a

discriminatory act that "'adversely affect[s] the terms conditions, or benefits of the

plaintiff's employment.'" *Holland v. Wash. Homes, Inc.*, 487 F.3d 208, 219 (4th

Cir. 2007). A reprimand, for example, becomes an adverse action "where the

employer subsequently uses [it] as a basis to detrimentally alter the terms or

conditions of the recipient's employment." *James v. Booz-Allen & Hamilton, Inc.*,

368 F.3d 371, 377 (4th Cir. 2004).

This description of adverse employment action is directly applicable to this

case. However, the lower Court failed to consider a number of material facts that

would support an adverse employment action. After rejecting Ms. Noshafagh's

arguments for failure to promote and lack of career progression and loss of job

responsibilities, the lower Court concluded that the only matter before it is the June

2011 reprimand. JA-1305 at ¶ 1. The lower Court, without any discussion or

hearing, ignored the other claims properly brought in the Complaint, addressed by

the Defendant in it's motion for summary judgment and again raised by Ms.

Noshafagh in her opposition.  Specifically, Ms. Noshafagh argued that her co-

workers called her names and were nasty to her (JA-13 at ¶ 11); that her reputation

at the workplace has been irreparably tarnished (JA-355); that she was

reprimanded (*Id.*); and that she received a negative job evaluation (*Id.*).

Based on the lower Court's Memorandum Opinion, it is unclear why Ms.

Noshafagh's arguments as to name calling, co-workers being nasty to her, and the

damage to her reputation are not adverse employment actions.  In fact, the lower

Court fails to even discuss those matters.  *See generally*, JA-1284.  As already

discussed, an adverse employment action is a discriminatory act that "'adversely

affect[s] the terms, conditions, or benefits of the plaintiff's employment.'"  *Holland

v. Wash. Homes, Inc.*, 487 F.3d 208, 219 (4th Cir. 2007).

There is no question that the actions taken by MCFRS against Ms.

Noshafagh had an adverse employment effect.  Ms. Noshafagh was subject to

harassment by her co-workers making animal sounds.  JA-398.  Her co-workers

made cat sounds and other animal sounds.  *Id*.  Her co-workers, specifically

Liberty Martin, would ring a bell everything Ms. Noshafagh walked by.  JA-434.

They would make fun of her accent.  JA-392. They would make her cover the 2400

Line when it was not her turn.  JA-452.  One of the managers would use profanity

against her.  JA-393.  All of these actions resulted in Ms. Noshafagh seeing a

therapist to deal with the effects of the harassment.  JA-515.  Management even

tried to get Ms. Noshafagh's confidential records from the psychologist she was

treating with.  *Id.*  Ms. Noshafagh was even forced to go to other floors to use the

bathroom, just so she could avoid encountering other employees.  JA-446.  These

acts do not simply amount to "petty slights, minor annoyances, and simple lack of

good manners" as alleged by the Defendant.  JA-67 (*citing Burlington Northern &

Santa Fe Railway Co. v. White*, 548 U.S. 53, 68, 126 S. Ct. 2405 (2006)).  They are

much more severe in nature, to the point that it adversely affected Ms. Noshafagh's

"terms, conditions, or benefits of...employment."  *Holland*, 487 F.3d at 219.

Viewed individually in a vacuum, the court and jury may conclude that they are

not adverse employment actions.

    Given the nature of discriminatory actions, it is very uncommon to have

direct evidence of discrimination.  *Hunt v. Cromartie*, 526 U.S. 541, 553 (1999).

Rather, discrimination is usually inferred from circumstantial evidence.  *See

generally*, *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133 (2000).

This must be the case here.  There are a number of actions that are directly linked

to discriminatory behavior.  Specifically, calling Ms. Noshafagh "Iranian Bitch

(JA-393 at ¶ 10), making fun of her accent (JA-392 at ¶ 5), referring to her as the

Iranian employee when Chief Courtney attempted to get her confidential records

(JA-515 ¶ 6), and meowing at Ms. Noshafagh in reference to a Persian cat.  JA-393

¶ 14.  These acts support a suspicion of discrimination based on national origin and thus establish a justifiable inference that other acts of harassment are also based on discriminatory motive.  The circumstances and the environment are sufficient to allow a reasonable juror to conclude that the harassment was national origin motivated, such that it was improper to grant summary judgment.  Essentially, the examples of discrimination taint all other occurrences of harassment, as it creates and inference that those too, were motivated by a discriminatory national origin basis.  Even one drop of racism is sufficient to poison the whole well.  This is consistent with logic, reality, and should be the law.

What is troubling and problematic is the fact that the lower Court never even considered a number of material facts.  The lower Court never discussed the 2400 Line with respect to an adverse employment action.  As set forth by the Ms. Noshafagh, the 2400 Line was not Ms. Noshafagh's responsibility.  JA-392 at ¶ 6.  Roxana Funes, however, would often times skip the back-up and instruct Ms. Noshafagh to cover the 2400 Line, despite the fact that it was not Ms. Noshafagh's duty.[3]  JA-393 at ¶ 7.  Roxana Funes would instruct Ms. Noshafagh to cover the

---

[3] The lower Court's recitation of the uncontroverted facts suggests that the it does not believe what Plaintiff said or credit her evidence, which is the role of the jury.  Specifically, the lower Court stated "Funes purportedly forced responsibility for answering the 2400 Line to Noshafagh by taking excessive time off; returning late from lunch breaks; and ignoring Noshafagh's rank in the trickle-down order in which OSC's were supposed to provide back-up coverage."  JA-1287.  The lower Court then fails to further consider this material fact.  "Credibility determinations,

2400 Line and then leave and return late or not return at all. JA-393 at ¶ 8. This is a detrimental change in Ms. Noshafagh's terms of employment, as she is not generally supposed to cover the 2400 Line. It is not her responsibility. If she does need to cover the 2400 Line, it is only supposed to happen after another employee is not available and then only for a brief amount of time. Again, it is unclear why the lower Court simply ignored this material fact and did not even consider it.

Similarly, and although stating that these "facts are uncontroverted or taken in the light most favorable to Plaintiff" (JA-1286), the lower Court goes on to state that "[t]he earliest *alleged* incident of harassment occurred on April 25, 2007, when...Martin and Funes *allegedly* 'repeated [Noshafagh's] pronunciation of the world while laughing and making jokes about [her] accent.'" JA-1286-7 (*emphasis added*). It is unclear why these facts only occurred "allegedly," but apparently the lower Court disregarded these facts. There is no discussion regarding this within the adverse employment action discussion.[4] Clearly, it is relevant within this discussion but the Court simply ignores it. This is also reversible error as it creates a genuine issue of material fact.

---

the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Reeves*, 530 U.S at 150 (*quoting Liberty Lobby*, 477 U.S. at 255.)

[4] The lower Court does discuss these facts, although very briefly, in the hostile work environment section.

Additionally, the lower Court does not consider the fact that management, specifically Chief Wayne Courtney, called Ms. Noshafagh's psychologist and demanded that her confidential records be produced. JA-515-6 at ¶¶ 6-7. Ms. Noshafagh had seen Dr. Beasley for a number of years to help her deal with the hostile and discriminatory environment at MCFRS. JA-515 at ¶¶ 4-5. She relied on the fact that her records were and would remain confidential in going to MCFRS' own clinical psychologist. JA-519. The fact that Chief Wayne Courtney attempted to acquire those records is clearly an adverse employment action. However, the lower Court again failed to even consider this matter.

Finally, as discussed *supra*, the May 19, 2010 negative performance review was properly raised in the EEOC complaints. This negative performance review creates an adverse employment action that the lower Court should not only have considered, but also concluded that there is at least a genuine issue as to material fact.

Taken together with the June 2011 written reprimand and the various harassing actions taken by MCFRS and it's employees, there is more than sufficient circumstantial evidence to create a genuine issue as to material fact with respect to whether there was an adverse employment action. Therefore, as there are a number of genuine issues as to material facts as to an adverse employment action,

and further, because the Court failed to even consider a large number of material facts, the lower Court erred in granting summary judgment and should be reversed.

### ii.    MCFRS' purported reason for the disputed action is a pretext for discrimination.

"If a plaintiff succeeds in making out a prima facie case, then the burden shifts to the employer, which must articulate a nondiscriminatory reason for the difference in discipline.  If the employer 'articulate[s] such a non-discriminatory reason, the burden shifts back to the plaintiff to demonstrate that the employer's reasons are not true but instead serve as a pretext for discrimination.'" *Lature v. Saint Agnes Hospital*, No. 10-1135 (4th Cir. 2010) (*citing Texas Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981)).  In evaluating the legitimacy or pretextuality of an employer's proffered justifications, the courts routinely examine a number of key factors.  For example, evidence establishing a pattern of adverse and disparate treatment directed against the plaintiff is always probative of pretext and/or unlawful animus.  *Corti v. Storage Tech Corp.*, 199 F.3d 1326, 1327 (4th Circ. 1999).  Evidence establishing that defendant failed to abide by its own stated policies likewise provides persuasive evidence of pretext.  *See e.g., McCall v. Myrtle Beach Hosp., Inc.*, No 96-1201 (4th Cir. 1997).

MCFRS failed to articulate a legitimate non-discriminatory explanation for the adverse employment actions taken against Ms. Noshafagh.  MCFRS simply denies that the alleged actions occurred, except for the bell ringing incident in which Liberty Martin received an "admonition."  JA-68 at ¶ 2.  As MCFRS cites, "a plaintiff's own assertions of discrimination in and of themselves are insufficient to counter substantial evidence of legitimate nondiscriminatory reasons for an adverse employment action."  JA-71 (*citing Williams v. Cerberonics, Inc.*, 871 F.2d 452, 256-57 (4th Cir. 1989).  The same is certainly true for MCFRS.  Bald denials in the face of evidence to the contrary is insufficient to support a motion for summary judgment.  At best, it creates a genuine issue of material facts, as "'[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.'" *Reeves*, 530 U.S. at 150 (*quoting Liberty Lobby*, 477 U.S. at 255).

### a.    The May 2010 performance review

As discussed *supra*, the May 2010 negative performance evaluation was properly before the lower Court and should have been considered.  The Defendant's purported non-discriminatory reason for Chief Lohr's "Below Expectations" rating is the bare bones assertion that Ms. Noshafagh's conduct toward her co-workers resulted in a negative performance appraisal with respect to

34

co-worker relationships. JA-84. MCFRS' minimal explanation simply cites the affidavit of Chief Lohr for this assertion, and nothing more. Surely, Chief Lohr has a strong interest in refuting allegations that he retaliated against Ms. Noshafagh. Thus, Chief Lohr's affidavit is no more dispositive of the issue than would be a Ms. Noshafagh's claim of unlawful discrimination based solely on her own affidavit.[5] *Williams v. Cerberonics, Inc.*, 871 F.2d 452, 256-57 (4th Cir. 1989) (stating that "a plaintiff's own assertions of discrimination in and of themselves are insufficient to counter substantial evidence of legitimate nondiscriminatory reasons for an adverse employment action."). Furthermore, Debra Shaw's intentional deceit and favoritism of Liberty Martin, as well as Chief Lohr's suspect evaluation of Ms. Noshafagh, considering that he knew about her prior allegations of discrimination, constitute sufficient evidence to rebut Defendant's reason for the negative performance review. *See e.g.*, *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 511 (1993) ("The factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of a *prima facie*

---

[5] It should also be noted that the reason for the negative performance appraisal in 2010 is that the Plaintiff is "unable to foster professional relationships with some of those who may not understand or respect her personal values." JA-464 Thus, the "professional relationships" for which Plaintiff is being punished for not being able to foster, is with the same people who are discriminating against her. Essentially, Plaintiff received a negative performance evaluation because she disagreed with the harassment she was being subjected to.

35

case, suffice to show intentional discrimination."). "Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination" because, "in appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose." *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. at 133, 147 (2000). As such, with respect to the May 2010 performance evaluation, there is no question that the Defendant's proffered reason is nothing more than a pretext.

### b.    The 2011 written reprimand

The lower Court's focus was solely on the 2011 written reprimand, as the lower Court did not even consider all the other evidence, discussed *supra*, of adverse employment actions. However, even if that is the only adverse employment action in front of the court, the lower Court still erred in concluding that MCFRS' proffered explanation was not a pretext.

First, the lower Court erred when it concluded, Ms. Noshafagh's argument that she is the only employee to be disciplined for discussing confidential information, was without merit. Liberty Martin was talking to Ashley Robinson about Ms. Noshafagh outside of work when she learned that Ms. Noshafagh talked to Ashley Robinson on a prior occasion.    JA-435 at 20:6-21:5. Liberty Martin

36

was talking to Jon Krespan after she forced herself onto an elevator that Ms. Noshafagh was riding when she learned that Ms. Noshafagh had spoken to Jon Krespan on a prior occasion. JA-435 at 21:19-22:18. Liberty Martin and Jon Krespan later spoke in Liberty Martin's office, with the door closed, about Ms. Noshafagh. JA-436 at 22:7-10. If discussing these matters with the individuals involved in the "confidential" matters was a breach of company policy, subjecting Ms. Noshafagh to written reprimand, then Liberty Martin was engaged in the same act and should have been reprimanded. However, she was not.

Similarly, in 2010, Chief Wayne Courtney called Dr. Michael Beasley and pressed him to disclose Ms. Noshafagh's personal psychological information. JA-515-6 at ¶ 7. Chief Wayne Courtney described Ms. Noshafagh as "the employee who was from Iran." JA-515 at ¶ 6. During the phone call, Dr. Beasley told Chief Wayne Courtney multiple times that he could not "divulge psychological information about patients, but Courtney would not take 'no' for an answer and kept pressing [him] for information. JA-515-6 at ¶ 7. In response to this, Ms. Noshafagh complained to Chief Lohr about Chief Wayne Courtney calling Dr. Beasley. JA-401 at 25:5-8. The MCFRS website states that "[t]he highest priority of the Team are placed on confidentiality and respect for the feelings of the individuals involved. JA-519. The website also states that "[c]onfidentiality is strictly enforced and note taking is not allowed." *Id.* Here again, is an example of

an MCFRS employee speaking about and trying to acquire highly personal and confidential information from a psychologist. Despite this, Chief Wayne Courtney was never reprimanded, while Ms. Noshafagh was reprimanded for speaking with the exact people involved in the allegedly "confidential" matters. The lower Court, however, does not even consider this material fact. The lower Court's failure to do so is reversible error, as there is a genuine dispute of material fact.

Second, the Court also erred when it concluded that pretext cannot be inferred from the delay in investigating Ms. Noshafagh's alleged confidentiality breach. JA-1310. An employer's violation of it's own internal procedures can be evidence of pretext. *Blasic v. Chugach Support Servs., Inc.*, 673 F.Supp.2d 389, 401 (D.Md. 2009). Here, contrary to their own guidelines, MCFRS waited five months before it began investigating and thereafter reprimanding Ms. Noshafagh for the alleged breach of confidentiality. JA-468. This creates a sufficient inference that the proffered reason was simply a pretext for the discriminatory basis behind the adverse employment action. Even if this is insufficient on it's own, all of the material facts discussed herein, at the very least, create a triable issue for the jury. There are genuine issues as to material facts which the lower Court erred in ruling on and therefore should be reversed.

**2.      The lower Court erred when it determined that there were no genuine issues of material facts with respect to Ms. Noshafagh's retaliation claim.**

To establish a *prima facie* case of retaliation, the Plaintiff must demonstrate that "(1) he engaged in protected activity, (2) he suffered an adverse employment action at the hands of [his employer]; and (3) [the employer] took the adverse action because of the protected activity." *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 190 (4th Circ. 2001); *see also Bernstein v. St. Paul Cos.*, 134 F.Supp.2d 730, 740 (D.Md. 2001). Once a prima facie case is established, the employer is permitted to defend its actions by producing "evidence of a legitimate, non-discriminatory reason for taking the adverse employment action." *Spriggs* at 190. If the employer does so, then the Plaintiff must show that this was a pretext. *Hoyle v. Freightliner, LLC*, 650 F.3d 321, 337 (4th Cir. 2011).

**i.      May 2010 negative performance evaluation**

**a.      Ms. Noshafagh established a *prima facie* case of retaliation with respect to the May 2010 negative performance evaluation.**

As discussed *supra*, the May 2010 negative evaluation was not procedurally defective and was properly before the lower Court. As Defendant concedes that

Ms. Noshafagh's October 2009 verbal Internal Affairs complaint, as well as all three of her formal EEOC charges, constitute protected activity, this prong of the *prima facie* requirement is established.  JA-1311.

In *Burlington N. & Santa Fe Railway Co. v. White,* 548 U.S. 53, 67 (2006), the United States Supreme Court held that a Title VII retaliation plaintiff need not allege or prove an ultimate adverse employment action, because "[t]he scope of the anti-retaliation provision extends beyond workplace-related or employment-related retaliatory acts and harm.".  The Court ruled that Title VII's retaliation provision requires a plaintiff simply to allege and prove "that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* at 68 (citations and internal quotation marks omitted).

The "Below Expectations" performance review was materially adverse because it was the first time Ms. Noshafagh had ever received a negative review, and the only reason cited for the negative performance was Ms. Noshafagh's inability to get along with the very people who were harassing her in the office. JA-462; JA-392 at ¶ 4.  Since the performance review created a blemish on Ms. Noshafagh's professional record, and no similar blemish was placed on the records

of her harassers, any reasonable worker would view the action taken as a warning to cease and desist from continuing to pursue her prior charges of discrimination.

Next, Ms. Noshafagh also met and exceeded her burden of showing a causal link between the "Below Expectations" performance review and her prior internal affairs complaint, because "[a] *prima facie* showing of causation requires little proof." *See Karpel v. Inova Health System Services*, 134 F.3d 1222, 1229 (4th Cir. 1991) (plaintiff stated a *prima facie* case even though there was no evidence of causal connection other than the fact that plaintiff was fired after bringing a lawsuit). The fact that Ms. Noshafagh received a negative performance rating solely for her "unresolved conflicts" with Liberty Martin and others, but Liberty Martin never received any negative performance rating for her flagrantly inappropriate conduct, is highly indicative of retaliation for Ms. Noshafagh engaging in protected activity.

Chief Lohr and the rest of management, including Debra Shaw, were aware that Liberty Martin made cat sounds toward Ms. Noshafagh every time Ms. Noshafagh walked by, as reference to a Persian cat. Chief Lohr and Debra Shaw were also aware that Liberty Martin was ringing a bell every time Ms. Noshafagh walked by her. As "punishment" for this bizarre behavior, Liberty Martin received nothing more than a "counseling memo" from her direct supervisor, Debra Shaw, instructing her to stop the behavior. JA-1292. In fact, Liberty Martin told Debra

Shaw that she was caught ringing the bell every time Ms. Noshafagh walked by. JA-415 at 7:14-19:1.  Debra Shaw did not counsel Liberty Martin until instructed to do so by Edward Radcliffe after another employee complained about the bell ringing.  JA-416 at 21:5-20.  Debra Shaw did not intend to discipline Liberty Martin for ringing the bell, and despite the "counseling memo," Debra Shaw gave Liberty Martin an "Exceptional Performance" rating for the evaluation period which covered the time when she was counseled for harassing Ms. Noshafagh.  JA-420 at 34:1-10.  Debra Shaw is on record agreeing with Chief Lohr that an employee's disciplinary record would be considered by a supervisor when doing the performance evaluation of a subordinate.  JA-419 at 31:6-13.  However, the "counseling memo" that Liberty Martin was issued for ringing the bell during this performance appraisal period was not mentioned anywhere.  Debra Shaw even admits that the reason she did not include the "discipline" on the performance appraisal is that the "counseling memo" is not really discipline since it is not on the level of "disciplinary action."  JA-420 at 34:1-7.  Thus, Liberty Martin was not disciplined in the same manner as Ms. Noshafagh and did not suffer the same consequences for her behavior.  Moreover, the bell incident was especially egregious considering that the disciplinary Chief, Michael Leigh, was present during some of this harassing, hostile conduct.  JA-434 at 16:10-18.

The lower Court erroneously asserted that Liberty Martin's "Exceptional Performance" rating and Ms. Noshafagh's "Below Expectations" rating are not similarly situated because each person was reviewed by different supervisors and because "it is not clear that Liberty Martin engaged in conduct that is comparable to Plaintiff's, as there is no evidence that Liberty Martin had conflicts with other co-workers or supervisors on the 12th Floor." JA-1291. This conclusion is wholly disingenuous because the corroborated bell-ringing incident alone is sufficient evidence to merit a less-than-perfect performance review, with regard to conflicts with one's co-workers. Furthermore, the record reflects that Ms. Martin was embroiled in a long, drawn out conflict with Ms. Noshafagh, considering that "during the period from 2008 to 2011, Ms. Martin made no fewer than nine reports to management complaining about Ms. Noshafagh's unprofessional behavior, lack of courtesy, and poor work performance." JA-342-9. The fact that Ms. Martin only received a "counseling memo" as a consequence of her immature, bizarre, hostile conduct toward Ms. Noshafagh — *in the presence of* a supervisor at times — further evidences a conspiratorial relationship among supervisors against Ms. Noshafagh. At the very least, the "counseling memo" controversy creates a genuine issue of material fact that should be reserved for resolution by the fact-finder.

43

Additionally, the lower Court's dismissal of the issue based on the fact that Ms. Martin and Ms. Noshafagh had separate reviewers should be held in further suspicion because Liberty Martin's reviewer was Debra Shaw. The record reflects that from the beginning Debra Shaw was one of Ms. Noshafagh's harassers and an active participant in the culture of hostility toward Ms. Noshafagh.[6] Therefore, the fact that Debra Shaw gave Liberty Martin an "Exceptional Performance" rating and intentionally omitted any reference to the bell-ringing incident further supports Ms. Noshafagh's claims of disparate treatment and retaliation.

It is also important that Ms. Noshafagh's reviewer was Chief Lohr. From the beginning, Chief Lohr had specific knowledge of Ms. Noshafagh's discontent and feelings of harassment because Ms. Noshafagh reported her original 2009 internal affairs complaint directly to Lohr. JA-392 at ¶ 4. Indeed, Lohr was the one who referred Ms. Noshafagh to internal affairs investigator Zeigler regarding the matter. Therefore, the record presents a strong inference that Chief Lohr gave Ms. Noshafagh a "Below Expectations" rating in retaliation for Ms. Noshafagh's prior complaint.

The totality of the circumstances reflects a series of discriminatory acts and a conspiracy among some of Ms. Noshafagh's supervisors and co-workers. The record supports the inference that management was growing increasingly hostile to

---

[6] For example, Debra Shaw falsely reported to Chief Lohr that Plaintiff was leaving work early. JA-409 at 43:6-12.

Ms. Noshafagh over time.  As Ms. Noshafagh stated in EEOC charge #2, the

conspiratorial management worked to establish a paper trail against her.  JA-523-4.

Thus, it is reasonable to infer from the circumstances that Chief Lohr intentionally

waited until the opportunity arose to retaliate vis-à-vis the May 5, 2010

performance review.

### b. Ms. Noshafagh has rebutted Defendant's purported non-discriminatory reason for the adverse action.

As discussed in section B(1)(ii)(a) *supra*, Ms. Noshafagh has rebutted

Defendant's purported non-discriminatory reason for the adverse employment

action.  As such, the lower Court's decision with respect to the May 2010 negative

performance evaluation retaliation claim should be reversed, as there are genuine

issues as to material facts.

### ii. June 2011 written reprimand

The lower Court concedes that, at the very least, Ms. Noshafagh established

a *prima facie* case of retaliation with respect to the June 2011 written reprimand.

JA-1313-4.  Nevertheless, the lower Court concludes that Ms. Noshafagh cannot

meet her burden of showing that the proffered reason for issuing the June 2011

written reprimand was a pretext.  JA-1314.  However, as discussed in the section

B(1)(ii)(b) *supra*, Ms. Noshafagh has provided more than sufficient explanations for why MCFRS' proffered reason was pretextual. Even if one explanation given is insufficient by itself, and Ms. Noshafagh believes that is not the case, when looked at as a whole, it is clear that the reasons given were pretextual. As this creates a genuine issue of material fact, the lower Court's decision should be reversed and remanded.

### iii.    Harassment increased after protected activity

It is also important to note that the harassing behavior complained of by Ms. Noshafagh increased in scope and severity after she filed her 2009 complaint, as well as her subsequent EEOC complaints. The earliest instance of retaliation occurred in 2007. JA-392 at ¶ 5. The biggest contention thereafter was the 2400 Line. JA-392 at ¶ 6. However, once the first complaint was filed, the harassment that Ms. Noshafagh was subject to increased significantly. For example, MCFRS started keeping close track of the Admin Calendar. JA-393 at ¶ 11. Liberty Martin began ringing a bell, for which she was barely disciplined. JA-400 at 19:10-5. The false reports sent to management about what Ms. Noshafagh was doing increased. JA-439 at 36:11-7And Dr. Beasley was contacted to try and get confidential psychological information. JA-515 at ¶ 6. These actions were in addition to the harassment that Ms. Noshafagh was already subject to. The

46

increase in harassment, however, creates circumstantial evidence and an inference

that they occurred in retaliation for the internal complaint and EEOC actions.  As

such, there is again a genuine issue of material fact.[7]

3.    **The lower Court erred when it determined that there were no genuine issues of material facts with respect to Ms. Noshafagh's hostile work environment and retaliatory hostile work environment claims.**

In order to prove a discriminatory hostile work environment claim, the

Plaintiff must demonstrate that the harassment was (1) unwelcome, (2) because of

national origin, (3) sufficiently severe or pervasive to alter the conditions of

employment and create and abusive atmosphere, and (4) imputable to the

employer.  *Gilliam v. South Carolina Dep't of Juvenile Justice*, 474 F.3d 134, 142

(4th Cir. 2007); *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 183-84 (4th Cir.

2001).  Furthermore, "retaliatory harassment can [comprise the necessary] adverse

employment action[,]" to support a Title VII hostile work environment claim.  *Von*

*Gunten v. Maryland*, 243 F.3d 858, 869 (4th Cir. 2001) (en banc).  Additionally, to

determine whether a reasonable person would find conduct hostile, a court

[7] Once again, it should be noted that the lower Court completely discounts these facts and does not even consider them.  They are clearly material and should clearly have been part of the court's consideration and determination.  Failure to do so is reversible error.

considers the totality of the circumstances, including "frequency of the

discriminatory conduct; its severity; whether it is physically threatening or

humiliating, or a mere offensive utterance; and whether it unreasonably interferes

with an employee's work performance." *Faragher v. City of Boca Raton*, 524 U.S.

775, 807-08 (1998) (*quoting Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21, 114

S.Ct. 367 (1993). "One of the critical inquiries in a hostile environment claim

must be the environment. Evidence of a general work atmosphere therefore - as

well as evidence of specific hostility directed toward the plaintiff - is an important

factor in evaluating the claim." *Mosby-Grant v. City of Haqerstown*, 630 F.3d 326

(4th Cir. 2010).


### i.    The harassment was based on Ms. Noshafagh's national origin.

As there is no question that the harassment complained of was unwelcomed,

Ms. Noshafagh will focus on the remaining prongs of the claim. In order to

survive summary judgment, Plaintiff must present sufficient evidence that the

harassing conduct "was motivated by [national origin or retaliatory] animosity."

*Gilliam v. South Carolina Dep't of Juvenile Justice*, 474 F.3d 134, 142 (4th Cir.

2007); *see also*, *Wrightson v. Pizza Hut of Am., Inc*., 99 F.3d 138, 142 (4th Cir.

1996). The lower Court summarily dismisses all but one of Ms. Noshafagh's

allegations of harassment, because on their face, they are "national origin-neutral." JA-1316-7. "One of the critical inquiries in a hostile environment claim must be the environment. Evidence of a general work atmosphere therefore - as well as evidence of specific hostility directed toward the plaintiff - is an important factor in evaluating the claim." *Mosby-Grant v. City of Hagerstown*, 630 F.3d 326 (4th Cir. 2010). So although some of the harassing conduct may appear to be "national origin-neutral" on their face, the Court must still consider them and determine whether they create a discriminatory hostile work environment. Considering that Court stated the conduct was "highly inappropriate," Ms. Noshafagh has at minimum shown that there existed a hostile work environment.

In support of it's conclusion that the conduct was not national origin motivated, the lower Court cites to *Khoury v. Meserve*, 268 F.Supp.2d 600, 612 (D. Md., 2003) at 612 and *Rose v. Son's Quality Food, Co.*, No AMD 04-3422, 2006 WL 173690, at *4 (D.Md. Jan 25, 2006). However, those two cases are distinguishable as neither involved any harassment that explicitly referred to her national origin. As demonstrate before, however, that is not so here. Ms. Noshafagh was referred to as an Iranian bitch. JA-393 at ¶ 10. When Chief Wayne Courtney called Dr. Beasley, he referred to Ms. Noshafagh as the Iranian employee. JA-515 at ¶ 6. Cat sounds were made towards Ms. Noshafagh in reference to Persian cats. JA-393 at ¶ 14. Ms. Noshafagh was made fun of for

incorrectly pronouncing English words. JA-392 at ¶ 5. These types of facts were not present in the cases the lower Court relied on. At the very least, this creates a genuine issue as to material fact, pursuant to which the grant of summary judgment was inappropriate.

### ii. The harassing conduct was severe and pervasive such that it altered the conditions of her employment.

The severe and pervasive element of the hostile work environment claim "has both subjective and objective components." *Ocheltree v. Scollon Prods., Inc.*, 335 F.3d 325, 333 (4th Cir. 2003) (en banc) (*citing Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21-22 (1993)). The Plaintiff must first show that he "subjectively perceive[d] the environment to be abusive." *Harris*, 510 U.S. at 21-22. Thereafter, the Plaintiff must demonstrate that the conduct was such that "a reasonable person in the plaintiffs position" would have found the environment objectively hostile or abusive. *Oncale v. Sundowner Offshore Serv., Inc.*, 523 U.S. 75, 81-2, 118 S.Ct. 998 (1998). As there is no question Ms. Noshafagh perceived the environment to be hostile, to lower Court focused it's discussion on the objective aspect of the test.

"[T]he objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances.'" *Oncale*, 523 U.S. at 81 (*quoting Harris*, 510 U.S. at 23). This

objective inquiry "is not, and by its nature cannot be, a mathematically precise test." *Harris*, 510 U.S. at 22. Rather, when determining whether the harassing conduct was objectively severe and pervasive, the court must look "at all the circumstances," including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonable interferes with an employee's work performance. *Id*. at 23.

Once again, without much discussion or review of the material facts, the lower Court summarily concludes that "the record does not establish that the alleged harassment was sufficiently severe or pervasive. Even if the jury resolved all factual disputes in Noshafagh's favor, the alleged harassment amounts to a series of isolated insults and sporadic teasing." JA-1320. This conclusion is clearly erroneous and must be reversed.

Ms. Noshafagh has been subject to harassment since 2007. JA-392 at ¶ 5. The environment became so severe that she filed an internal complaint in 2009, and three subsequent EEOC complaints. JA-392 at ¶ 5; JA-522-5. Ms. Noshafagh was subjected to harassment both by management and employees alike. Management has used profanity towards her. JA-392-4. She has been referred to as a "rat" and as "Iranian Bitch." JA-393 at ¶¶ 10, 15. Co-workers made animal sounds, such as cat meowing, in reference to a Persian cat. JA-393 at ¶ 14. They

made fun of her accent.  JA-392 at ¶ 5.  Management called her psychologist to get

confidential information.  JA-515 at ¶ 6.  She was given a negative performance

evaluation while other employees who were not able to build a relationship with

her, were not.  JA-420 at 34:1-7.  This harassment was continuous and pervasive

starting in 2007 to at least the time this instant matter was filed.  It is unclear what

would be objectively sufficient if what has been laid out here is not.  In fact, the

harassment was so severe, that Ms. Noshafagh sought psychological treatment.

JA-515 at ¶ 2-3.  Thus, there is no question that the environment was objectively

hostile, severe and pervasive and the judgment of the lower court should be

reversed.


**C.**     **The Lower Court Erred When It Determined That There Was No**

**Invasion Of Privacy - Intrusion Upon Seclusion Claim When No Private**

**Information Was Acquired.**

In Maryland, there are four causes of action for invasion of privacy, and

intrusion upon seclusion is one.  *Allen v. Bethlehem Steel Corp.*, 76 Md. App. 642,

547 A.2d 1105, cert. denied (1988).  Intrusion upon seclusion requires an

"intentional intrusion upon the solitude or seclusion of another of his private affairs

or concerns that would be highly offensive to a reasonable person."  *Furman v.*

*Sheppard*, 130 Md.App. 67, 73, 744 A.2d 583 (2000); *Klipa v. Bd. of Educ. of A.A.*

*Co.*, 54 Md.App. 644, 652, 460 A.2d 601 (1983). The elements of this tort are [1] an intentional intrusion upon another person's solitude, seclusion, private affairs or concerns [2] in a manner which would be highly offensive to a reasonable person. *Bailer v. Erie Ins. Exchange*, 344 Md. 515, 526, 687 A.2d 1375, 1380-81 (1997), quoting Restatement (Second) of Torts § 652B.

The Defendant argues, and the lower Court agrees, that because Chief Wayne Courtney did not acquire any of the information he requested and insisted on receiving, there was no intrusion upon seclusion. JA-1324-5. The lower Court goes on to state that this one isolated incident is not egregious enough to constitute an invasion of privacy. JA-1325. The lower Court is incorrect in this assertion.

*Klipa v. Bd. of Educ. of A.A. Co.*, 54 Md.App. 644, 652, 460 A.2d 601 (1983) is applicable. In *Klipa*, the Court analyzed the four torts of invasion of privacy and set forth their distinctions:

> Prosser summarized the law relative to this tort (or these four torts) when he said: It is evident that these four forms of invasion of privacy are distinct, and based on different elements. It is the failure to recognize this which has been responsible for much of the apparent confusion in the decisions. Taking them in order--intrusion, disclosure, false light, and appropriation--the first and second require the invasion of something secret, secluded or private pertaining to the plaintiff; the third and fourth do not. The second and third depend upon publicity, while the first does not, nor does the fourth, although it usually involves it. The third requires falsity or fiction; the other three do not. The fourth involves a use for the defendant's advantage, which is not true of the rest.

*Id*. (*citing Hollander v. Lubow*, 277 Md. 47, 57 (1976)).  As this discussion makes clear, the invasion upon seclusion claim does not have publicity of the private information as an element of the claim.  Comment a to the Restatement (Second) of Torts § 652A (1977) also clarifies the issue:

> The form of invasion of privacy covered by this Section does not depend upon any publicity given to the person whose interest is invaded or to his affairs.  It consists solely of an intentional interference with his interest in solitude or seclusion, either as to his person or as to his private affairs or concerns, of a kind that would be highly offensive to a reasonable man.

*Id*.

Therefore, even though Maryland courts have not yet directly deal with this issue, the comments and literature make clear that invasion of privacy - intrusion upon seclusion does not require that information be actually obtained.  The act of try to get that information by itself is sufficient.  That is precisely what happened here.  Chief Wayne Courtney contacted Dr. Beasley an insisted that Ms. Noshafagh's psychological records be released to him and in that call made reference to Ms. Noshafagh as the "employee who was from Iran."  JA-515 at ¶ 6. Dr. Beasley, quite appropriately, refused to disclose that information.  JA-516 at ¶ 7.  However, the act of trying to obtain the confidential information by itself is sufficient to put the issue in front of a jury.

Furthermore, the fact that this was just one call does not warrant a grant of summary judgment.  As *Mitchell v. Baltimore Sun Co.*, 164 Md.App. 497, 883

A.2d 1008, 1023 (2005) makes clear, even one attempt to obtain information is sufficient to allow a jury to find that the conduct was highly offensive. In *Mitchell*, reporters refused to leave the room after he requested that they do so.  *Id*. Similarly, the fact that Chief Wayne Courtney continued to request confidential information, after Dr. Beasley refused to provide it, is sufficient to create a genuine issue of material fact and a reversal of the lower Court's decision.

## CONCLUSION

The lower Court should not have concluded that the May 5, 2010 performance evaluation was procedurally barred from being considered. Additionally, as there are a number of genuine issues of material fact with respect to Ms. Noshafagh's Title VII claims, as the lower Court either didn't give them the proper weight or even considered them, this Court should reverse the lower Court's dismissal of the Title VII claims.  Furthermore, as acquisition of the private and confidential information is not an element of the tort of intrusion upon seclusion, this Court should reverse the lower Court's dismissal of that claim and the entire lawsuit.

## REQUEST FOR ORAL ARGUMENT

Appellant hereby requests oral argument.

Respectfully submitted,



_____

/S/

A.P. Pishevar (Md. Fed. Bar No. 12106)
**PISHEVAR & ASSOCIATES, P.C.**
226 N. Adams Street
Rockville, MD 20850
Phone: (301) 279 – 8773
Fax:    (301) 279 – 7347
ap@pishevarlegal.com
Counsel for the Appellant


## CERTIFICATE OF COMPLIANCE

This brief has been prepared using Fourteen point, proportionally spaced, serif typeface, Times New Roman, Microsoft Word 2003.  Excluding the Corporate Disclosure Statement, Table of Contents, Table of Authorities, Request for Argument, Certificate of Compliance, and Certificate of Service, the Opening Brief contains 12,419 words.



_____

/S/

A.P. Pishevar (Md. Fed. Bar No. 12106)


## CERTIFICATE OF SERVICE

I certify that on May 10, 2013, I electronically filed with the Clerk of the United States Court of Appeals for the Fourth Circuit using the CM/ECF system,

and further, copies are being furnished via Fedex, of Appellant's Opening Brief and

the Joint Appendix to:

     Jo Anna Schmidt
     Schmidt Dailey and O Neill LLC
     231 E Baltimore St Ste 1400
     Baltimore, MD 21202
     Email: jschmidt@sdolaw.com


     Katherine Colleen Hart Smith
     Hart Smith Law Office
     Key Bldg
     159 S Main St Ste 1110
     Akron, OH 44308
     Email: katherine@hartsmithesq.com


                                         /S/
                       A.P. Pishevar (Md. Fed. Bar No. 12106)